IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| WILLIE JOHNSON, JR. } | |
| } | |
| Plaintiff, } | |
| } | |
| v. } | CIVIL ACTION NO. H-03-4055 |
| } | |
| STEWART & STEVENSON } | |
| SERVICES, INC. } | |
| } | |
| Defendant. } | |

**AMENDED OPINION TO CORRECT
TYPOGRAPHICAL ERRORS IN DOCUMENT NUMBER 40,
MEMORANDUM & OPINION ON SUMMARY JUDGMENT**

Pending before the court is the Motion for Summary Judgment and Brief in Support (Doc. 26) of the Defendant, Stewart & Stevenson Services, Inc. (hereinafter "S & S") and the Defendant's Motion to Strike the Response to Motion for Summary Judgment. (Doc. 34.)

Plaintiff, Willie Johnson ("Johnson") brought the instant action pursuant 42 U.S.C. § 1983, alleging discrimination based upon race and retaliation for his opposition to perceived discrimination.[1]

**I.     Legal Standard : Summary Judgment**

A movant seeking summary judgment must inform the court of the basis of his motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R.Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor.  *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th

---

[1] Johnson has abandoned his claim for unlawful retaliation.  (Doc. 31, p. 4.)

Cir. 1986). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material; i.e., only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 248, 256-57 (1986). The movant need not negate the opposing party's claims nor produce evidence showing the absence of a genuine issue of fact, but may rely on the absence of evidence to support essential elements of the opposing party's claims. *Celotex*, 477 U.S. at 323-25. However, "[o]n summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (citing *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). If it is evident that the party seeking summary judgment against one who bears the proof burden has no access to evidence of disproof, and ample time has been allowed for discovery, he should be permitted to rely upon the complete absence of proof of an essential element. *Fontenot v. Upjohn,* 780 F.2d at 1195. If the moving party fails to meet its initial burden, the motion must be denied, regardless of the non-movant's response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

If the movant meets his burden, the burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial. Fed. R.Civ. P. 56(c). The non-moving party may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence, and specific facts showing that there is a genuine issue for trial. Fed. R.Civ. P. 56(e); *Anderson*, 477 U.S. at 256-157. The non-movant may point to evidentiary documents already in the record that set out specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). Furthermore, the non-movant does not likewise have to present its own evidence, but may point out genuine issues of fact extant in the summary judgment evidence produced by the movant, if any. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988).

## II.     Factual and Procedural Backgound

Willie Johnson, Jr. ("Johnson") began his employment with Stewart & Stevenson ("S & S") in 1984 as a welder in the "Power Generation" Department or Unit.  (Doc. 26, Ex. A, pp. 32:13-17, 39:7-11.)  When he was terminated on October 2, 2001, Johnson held the position of Mechanic III (Welder) in Power Generation.  (*Id*., Ex. A., p. 18:25-19:16; Exs. B-2, B-3, B-18.)  During the course of his 17 years of employment, Johnson obtained no additional welding certifications or optional training, though he received several periodic wage increases.  (*Id*., Ex. A, p. 79:14-80:2; 99:22-24; Ex. C ., ¶ 6.)  S & S also states Johnson had no contract for continued employment, and was, in fact, an employee-at-will throughout his employment.  (*Id*., Ex. B-1.)

Johnson's employment with Stewart & Stevenson was terminated on October 2, 2001, as part of an alleged reduction in force in his department which resulted in the termination of several employees.  (See *Id*., Exs. B-2, B-3.)  Through the affidavit of Scott Micheletti, S & S asserts that at the time of his termination in 2001, Johnson was directly supervised by Anthony Nguyen, a Supervisor for the Power Generation unit; Nguyen's Supervisor now and at that time was Scott Micheletti, Manager of the Power Generation Department; and, Debbie Johnston was, and is, the Human Resources Operations Manager for S & S's Engineered Products and Power Generation Departments.  (*Id.*, p. 3 (*citing* Ex. C, ¶¶'s 2 & 5.)  Johnson's termination letter from Debbie Johntson, dated October 2, 2001, stated that after a review of the Power Generation Division's financial condition, due to a slowdown in production, Johnson's employment was being terminated due to a reduction in force; Johnson takes issue with this letter's reasoning as it does not state he was terminated because of "job performance."  (Doc. 31, Ex. B; Doc. 26, Johnson Depo., Ex. B, p. 85:5-13.)   This is relevant because employees were evaluated on their performance as part of the reduction in force, and Johnson asserts this evinces a pretextual motive by S & S from the face of the letter.  Johnson states that at the time of his termination there were twenty (20) individuals in his group, and he was the only employee who was black.  (Doc. 31, Exh.

D.) The substance of Johnson's suit involves his claim that it was his race, and not other factors put forth by S & S, which led to his termination.

Stephen Hines, Vice President of Human Resources, explained that at the time of the reduction-in-force in 2001, he was sent a list of employees with recommendations of those that were to be reduced in force, ranked on a grading scale performed by Debbie Johnston. (Doc. 31, Hines Depo., Tab. E, p. 6:14-25.) S & S attaches records which it claims show that the process by which employees were chosen for lay-off involved a review and evaluation of several different objective factors, including attendance, seniority, safety and a performance appraisal. (See *Id.*, Exs. B-3 to B-5.) S & S asserts these factors were valued by percentage of a total score, which was then calculated based on those percentages, with employees earning the lowest scores then terminated unless other factors, such as special skills, mitigated the cause for termination. (*Id.*, p. 3.) The court's analysis of the spreadsheets provided by both sides yields[2] the following data concerning all lower-ranked employees after the evaluation, as discussed in the record and listed herein in descending order

|  | Title | Attendance | Seniority | Sen. Score | Safety | Perf Appraisal | Total | Race |
|---|---|---|---|---|---|---|---|---|
| John Rodriguez, Jr. | Welder-Senior | 75 | 16.50 | 100.00 | 80 | 76 | 79.35 | Hisp. |
| Phillip Ramos | Welder-I | 75 | 6.30 | 75.00 | 80 | 72 | 75.45 | Hisp. |
| Wilfredo Ostroga-Segura | Welder-I | 75 | 6.70 | 75.00 | 80 | 64 | 72.65 | Hisp. |
| Jose Velasquez | Welder-I | 75 | 4.44 | 50.00 | 80 | 69 | 71.90 | Hisp. |
| Willie Johnson, Jr. | Welder-Senior | 50 | 17.04 | 100.00 | 60 | 61 | 61.85 | Black |
| Ramon Anzaldua | Welder-Code | 0 | 12.21 | 100.00 | 80 | 77 | 60.95 | Hisp. |
| Jaime Diaz | Welder-I | 50 | 7.42 | 75.00 | 50 | 73 | 60.55 | Hisp. |
| Tiofilo Padilla | Welder-Code | 50 | 2.94 | 0.00 | 70 | 68 | 57.30 | Hisp. |
| Simon Jordan | Welder-Senior | 0 | 12.79 | 100.00 | 60 | 78 | 55.30 | White |

---

[2]Taken from information available from three sources. (Doc. 26, Ex. B-3; Doc. 31, Exs D, F & J.) The system of percentile-evaluations used to arrive at the raw scores is provided in Doc. 26, Ex. B-4.

Johnson attaches and makes reference to several documents apparently produced by S & S, one of which is a letter by S & S to the EEOC, signed by Stephen A. Hines and dated March 1, 2002, which letter asserts it is in reference to "additional information you requested concerning the above noted Charge of Discrimination by Willie Johnson, Jr." (Doc. 31, Ex. K, p. 1.) The letter states that the "other welders who were laid off (with less seniority than Charging Party) by name, date of layoff and seniority date" are Phillip Ramos (Reduction 9/05/2001) and Tiofilo Padilla (Reduction 9/05/2001). (*Id*.) The document also provides information on "two workers in the business unit under forty [years of age] not selected for reduction in force...because both workers had multiple skills that Willie Johnson, Jr. did not possess," and names these individuals as Jaime Diaz and John Rodriguez, Jr. (*Id*. at p. 2.)

In another part of its pleadings, S & S argues that of five employees, including Johnson, laid off due to a reduction in force in the fall of 2001, at least four other employees involved in the lay-off had less seniority than Johnson, were either Caucasian or Hispanic, and were terminated approximately one month prior to Johnson. (*Id*. (*citing* Micheletti Aff., Ex. C, ¶ 5.)) An attached spreadsheet provided by Johnson shows that Wilfredo Ostrega-Segura, Phillip Ramos, Tiofilo Padilla and Willie Johnson were terminated subject to a reduction in force on 9/18/01, 9/05/01, 9/05/01, and 10/02/01, respectively, while Jordan Simon and Avendano Amando are listed as "Out on Leave at time of reduction." (Doc. 31, Ex. J.)

Four employees received a lower grade and score than Johnson on the spreadsheet rankings produced for the court: Ramon Anzaldua (Hispanic male), Jaime Diaz (Hispanic male), Tiofilo Padilla (Hispanic Male), and Simon Jordan (Caucasian/White male). (Doc. 31; Tab F; Doc. 26, Ex. B-3.) Scott Micheletti stated that he retained two of these employees: Ramon Anzaldua and Jaime Diaz, who had lower scores than Johnson and the other employees who were laid off, because these two had more advanced skills and more duties and responsibilities than those others. (*Id.*, p. 3 (citing Ex. B-3; Micheletti Aff., Ex. C, ¶ 6.)) The court's own review of the record shows that Jaime Diaz had lower scores for seniority, safety, and for his performance appraisal than

Simon Jordan.  (Doc. 31, Tab. F.)  Nevertheless, Jaime Diaz had a higher performance appraisal score (73) than either Johnson (61), Phillip Ramos (72), or Wilfredo Ostroga-Segura (64), all of whom were terminated, or even Jose Velasquez (69) who was retained.  (Doc. 31, Debbie Johnston Depo., Tab. H., p. 13:4-9; *See also* Ex. F.)  Stephen Hines could not recall whether Simon Jordan was terminated.  (Doc. 31, Hines Depo., Tab. E, p. 12:5-9.)  However, it is argued at several points that Jordan was in fact not terminated.  Scott Micheletti also stated in his deposition that Human Resources was solely responsible for the grading of employees, but he was also given discretion on which employees were retained.  (*Id*., Micheletti Depo., Tab I, p. 10:1-12.)  He recommended that Ramon Anzaludua and Jaime Diaz not be reduced at the time of the reduction, but agreed that someone else may have made the decisions with respect to the other employees who were retained.  (*Id*., pp. 10:18-21; 20:1-15.)

Jose Velasquez, one of the employees retained, had worked for S & S for four years in 2001 and was ranked one position higher than Johnson.  (Doc. 31, Tab. F, Velasquez Depo., Tab G, p. 4:20-25.)  Velasquez explained that he did not receive a letter from Debbie Johnston of Human Resources notifying him of his layoff due to a reduction in force, but that sometime in 2001 he was instead told to go to the "front office" and told in person that he would be reduced in force; however, he explains that he and Ramon Anzaldua were thereafter given the same option of transferring to another position instead of being terminated and both took that option.  (*Id*., Velasquez Depo., Tab G, p. 9:7-13:24.) Though Velasquez at first stated that he was terminated in April or May, 2001, he later stated he could not remember the exact time.

S & S points out that Johnson admitted he was *also* offered the opportunity by Debbie Johnston of Human Resources to work at other facilities once an opening came up, apparently an offer made after he was also reduced, and he admits Debbie Johnston even tried to offer to get him some interviews; however, he states that those positions would have required that he start there like a "new man" to "start off just like somebody is walking in the door."  (Doc. 26, Johnston Depo., Ex. A, p. 122:11-24; 125:22-126:8.)  Johnston asserts that he did not take

advantage of such an offer because "the decision was already made," and then because three weeks after his termination on October 2, 2001, he suffered a stroke due to stress from his termination and divorce proceedings initiated by his wife, though he is still married at this time. (*Id*., Ex. A, p. 126:8-14; 19:17-20:18.)

Johnson retorts in his Response to Defendant's Motion for Summary Judgment (Doc. 31), relying upon his own deposition statements to the same effect, that he was a long-term employee with greater work experience than other employees, but that others with shorter work histories were retained by S & S, and some of the welders retained were in fact individuals he had himself trained. (Doc. 31, Johnson Depo., Tab. A, p. 45:1-25, 46:1-10.) Johnson argues that he did not learn of the "pretextual position" of the company until after his termination. (Doc. 31, p. 6.) Johnson stated he realized that other employees still had their positions or job and were not being laid off; however, although Johnson first stated at his deposition that he was the only person terminated, he later admitted that he did not know how many people were in fact terminated in the reduction in force in October 2001. (Doc. 31, Johnson Depo., Ex. A, p. 103:23-104:23.)

When questioned about the subject of his suit, Johnson testified as follows

Q. Mr. Johnson, your lawsuit is - alleges that you were discriminated against, correct?

A. Yes.

Q. What's the basis of discrimination?

A. I've been working for Stewart & Stevenson 18 years, all right. There was guys working three years, four years, they were still in place. And I worked for Stewart & Stevenson a long time and I was just singled out, you know, to be laid off, a man working there 18 years. (Doc. 26, Johnson Depo., Ex. A, p. 44:25-45:9.)

A. Well, what I'm saying the basis of my lawsuit is, you know, these guys that I trained and had less time and less seniority, less education, I think I should have deserved the same rights they had.

Q. Which was to keep the job?

A. Keep their - they kept their job and I trained some of these people. They had less education. I had more

>> education than my supervisor, Scott Micheletti and Anthony Nguyen.
>> ...
>> 
>> Anthony Nguyen do not have no college time. Scott Micheletti do not have - some of these guys can't even pass the entrance exam to go to college. Why couldn't I keep my job and the rights to retire on my job? Just let me finish do my job and let me retire and all this here wouldn't have been a problem. (*Id.*, Ex. A, p. 58:14-59:3.)
>
> Q. Well, you're saying that he [Nguyen] harassed you and that's the basis for saying that he discriminated against you, correct?
>
> A. I'm saying I'm discriminated because I did not get - have the right as anybody else to keep my job. (*Id.*, Ex. A, p. 60:18-22.)

Johnson also has stated his "*belief*" that his termination evolved out of, or was influenced by, his supervisor, Anthony Nguyen's dislike for black people, and Johnson states that he was "singled out" by Nguyen; however, Johnson admits he does not know if Nguyen was the person who made the decision about who was to be laid off. (*Id.*, Ex. A, p. 48:23-49:5.) S & S points out that Johnson's termination or reduction in force was not decided by Nguyen but by Human Resources and Scott Micheletti. (*Id.*, Micheletti Aff., Ex. C, ¶ 5.) Nevertheless, Johnson stated in his deposition

> [m]y basis of my suit is I was terminated because Anthony Nguyen – I believe he didn't like me and because of the racial tension, tensions that transpired between he and I. (*Id.* at p. 138:7-10.)

Nguyen supervised Johnson for about two years, acted as a "lead man" in Johnson's department for one or two years, and Johnson describes the circumstances of his relationship with Nguyen as follows: Nguyen would "single [Johnson] out every day"; Nguyen hassled and stressed Johnson by "bird-dogging" and watching him work; Nguyen would stand over him all the time, waiting for him to make a wrong move; further, Johnson states he had "whatever kind of problem you could imagine with Anthony Nguyen," that "[Nguyen] was the type of person who didn't like black people in general," that Nguyen "had that kind of hostility towards blacks;" however, Johnson did not have problems with Chuck Burkhart, another Supervisor, or Scott Micheletti. (Doc. 31,

Johnson Depo., Tab. A, p. 49:1-25, 50:1-11, 50:22-23, 51:1-5, 52:1-25, 54:4-25.)  S & S argues, through the affidavit of Scott Micheletti, that

> To my knowledge, neither myself nor Nguyen nor any other employee of Stewart & Stevenson ever discriminated against Johnson in any fashion, or used any racial slurs or epithets in reference to Johnson.  I observed that Nguyen treated Plaintiff the same as all other employees he supervised, except in his requests to Johnson to increase his work speed.  I never received any complaints from Johnson that he had been discriminated against or treated in an unequal fashion by Nguyen or any other supervisory employee.  (Doc. 26, Micheletti Aff., Ex. C., ¶ 4.)

In fact, Johnson also admitted in response to questioning in his deposition that Nguyen did not make negative comments toward him

> Q:   Did [Nguyen] ever make any negative comments to you about your race?
>
> A:   Race? Not that I can recall.
>
> Q:   Did anyone that you can think of at [S & S] ever use any racial slurs or say anything negative to you about your race?
>
> A:   Not that I can recall at this present time.   (*Id*., Johnson Depo., Tab. A, p. 49:24-5.)

At other points in his deposition, Johnson reversed himself and stated that Nguyen made racial comments or slurs, but that he could not "remember exactly" what was said after too much time, and he "programmed this out of [his] mind because it really wasn't important to [him]." (Doc. 31, Johnson Depo., Ex. A, p. 136:1-25.)  When pressed for specifics, Johnson reiterated that Nguyen made comments to him, but when asked whether Nguyen made racially-based comments, racial-slurs or racial remarks to him, he stated, "I can't go back because I can't recall at this time the specifics that he did or did not." (*Id*., Ex. A, p. 137, p. 137:21-138:4.) The following discussion also occurred later in Johnson's deposition regarding whether Johnson would recall Nguyen's comments

> Q.   When are you going to recall?
>
> A.   That was not the basis of my suit.  My basis of my suit is I was terminated because Anthony Nguyen – I believe that he didn't like me and because of the racial tension, tensions that transpired between he and I.

> Q. But there has to be – do you understand that you have made allegations about this man that he racially discriminated against you and what I'm asking you is to tell this jury what the basis of that is? Do you understand that?
>
> A. Yes. The basis of it is –
>
> Q. What is the basis of it?
>
> A. The basis of it is right here.
>
> Q. The fact that you were laid off?
>
> A. The fact that I was laid off and these people here are steady working.
>
> Q. Okay. And that's –
>
> A. That speaks for itself. (*Id.*, Ex. A, p. 138:6-25.)

Johnson asserted at an even later point in his deposition that Nguyen made racial comments at the job site "maybe about once a month" but there were no witnesses to it and he could not remember what these comments were; Johnson stated he would remember such comments by the time of trial even though he could not recollect one comment at that time. (Doc. 26, Ex. A, p. 169:8-172-11.) Johnson also admits he never told Deborah Johnston about Nguyen's alleged comments. (*Id.*, Ex. A, p. 103:16-22.)

Johnson stated that there was one other black employee at S & S, but Nguyen did not single out that employee, that "it was just something about me [Johnson]." (Doc. 26, Ex. A, p. 55:2-12.) Johnson reasoned that Nguyen's concentration on him might have to do with his military service in Vietnam, as the other black employee had no military service, and as Nguyen is apparently Vietnamese-American. (*Id.*, Ex. A, p. 55:15-23.) In fact, at one point in his deposition, Johnson posited about Nguyen

> He gave me the impression that he – a black guy must have made love to his wife or something in Vietnam or something or his sister or something. He was just in hostility – (*Id.*, Ex. A, p. 52:7-10.)

Finally, Johnson admitted at several points in his deposition that he had no basis for saying that Nguyen hated African-American employees in general, nor could he identify any African-American employee that was treated discriminatorily by Nguyen, nor what occurred with such employee; rather, Johnson emphasized

that Nguyen just did not like him personally. (Doc. 26, Johnson Depo., Ex. A, pp. 55:7-20; 56:19-21; 61:20-62:21; 62:25-66:8; 66:8-67:20.)

Several months after his termination in October, on December, 2001, Johnson filed a Charge of Discrimination with the Texas Commission on Human Rights and the Equal Employment Opportunity Commission ("Charge"), in which he alleged a claim for race discrimination as a prerequisite to a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Title VII). (Doc. 26, Ex. B-17.) Johnson subsequently amended his Charge to include claims for retaliation, age discrimination, and disability discrimination. (*Id.*, Ex. B-18.) Johnson's Notice of Right to Sue was mailed on March 25, 2002. (*Id.*, Ex. B-19.) Nevertheless, Johnson did not file a lawsuit until October 1, 2003 - almost 19 months later. Johnson then filed this lawsuit alleging claims for race discrimination and retaliation under section 1981, a statute which does not impose any administrative deadlines or prerequisites. Only Johnson's section 1981 race discrimination or disparate discharge claims remain at issue, as Johnson has abandoned his other claims.

**III.    Analysis**

Johnson alleges causes of action for racial discrimination/disparate treatment under Section 1981, and as both Title VII and § 1981 are governed by the same evidentiary framework, *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n.2 (5th Cir. 1996) the court may look to Title VII precedent in conducting this analysis.

Under the Title VII/ §1981 framework, Johnson must prove that S &S discriminated against him by presenting a *prima facie* case through offering direct or circumstantial evidence. *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994). Direct evidence includes any statement or written document showing a discriminatory motive on its face. *Portis v. First National Bank of New Albany, MS*, 34 F.3d 325, 329 (5th Cir. 1994). "Direct evidence is evidence which, if believed, proves the fact [of intentional discrimination] without inference or presumption." *Id.* at 328-29 (quoting *Brown v. East Mississippi Elec. Power Ass'n,* 989 F.2d 858, 861 (5th Cir. 1993)). In other words, to qualify as direct evidence of discrimination, an employer's comment "must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that race was an impermissible factor in the decision to terminate the employee." *E.E.O.C. v. Texas Instruments Inc.*, 100 F.3d 1173, 1181 (5th

Cir. 1996). Furthermore, the fact that a plaintiff's case-in-chief consists solely of his own testimony does not prevent him from establishing intentional discrimination. *Portis*, 34 F.3d at 329 n.10; *See also Vance v. Union Planters Corp., et. al.*, 209 F.3d 438, 442 (5th Cir. 2000) (employer's remark "that he wanted to hire a mature man" qualifies as direct and material evidence of sex discrimination even if the plaintiff was the only witness to testify about the remark.)

Because direct evidence is often rare, a plaintiff ordinarily establishes a *prima facie* case through circumstantial evidence. Johnson can establish a *prima facie* case through circumstantial evidence by providing that he (1) is a member of a protected class; (2) was qualified for his position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or in the case of disparate treatment, if he shows "that others similarly situated were treated more favorably." *Okoye v. University of Texas Houston Health Science Center*, 245 F.3d 507, 512-13 (5th Cir. 2001); *See also Price v. Federal Express Corp.*, 283 F.3d 715, 719 (5th Cir. 2002). A plaintiff in a reduction-in-force case is generally not replaced at all, and to establish his prima facie case, he need not prove that he was replaced by someone outside the protected class. *See Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003). "Thus, in situations where the employer reduces its workforce and does not plan to replace the discharged employee, "the fourth element is 'that after [the] discharge, others who were not members of the protected class remained in similar positions'"." 325 F. Supp. 2d 755, 768-69 (E.D. Tex. 2004) (*citing Bauer v. Abemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999)). Hence, in order to establish a *prima facie* case of discrimination in a reduction-in-force case, a plaintiff may show:

(1) she is a member of a protected class;

(2) she was adversely affected by the employer's decision;

(3) she was qualified to assume another position; and

(4) others who were not members of the protected class remained in similar positions.

*Id*. at 769 (*citing Bauer*, 169 F.3d at 966; *Meinecke v. H & R Block of Houston*, 66 F.3d 77, 83 (5th Cir. 1995); *Vaughn v. Edel*, 918 F.2d 517, 521 (5th Cir. 1990)). "A plaintiff need only show "evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *Palasota*, 342 F.3d at 576 (*citing Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996)).

In proving his case through circumstantial evidence, Johnson's claims of discrimination are governed by the tripartite burden-shifting scheme established in *McDonnell Douglas v. Green*, 411 U.S. 792, 802-04 (1973). Under this test, (1) if Johnson establishes a *prima facie* case of discrimination, then a presumption of discrimination arises and (2) the burden shifts to S & S to articulate a legitimate, non-discriminatory reason for its employment action. *Price*, 283 F.3d at 720. In *Reeves v. Sanderson Plumbing Prods., Inc.*, the Court stated that under Title VII, a plaintiff's *prima facie* case, "combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

The test utilized in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), a "mixed-motive" theory of discrimination, used to come into play where *direct* evidence of discrimination is presented, but the employer asserted that the same adverse employment decision would have been made regardless of discrimination. *Mooney v. Aramco Serv's. Co.*, 54 F.3d 1207, 1216 n.10. (5th Cir. 1995). Though *Price Waterhouse* can be characterized as a method to prove discrimination, the mixed-motives theory is probably best viewed as an affirmative defense for the employer. *Id*. at 1216. However, in *Desert Palace Inc. v. Costa*, 539 U.S. 90, 101 (2003), the Supreme Court unanimously held that in the context of Title VII, as amended by Congress in 1991, "direct evidence of discrimination is not required in mixed-motive cases." *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 310 (5th Cir. 2004). In *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (*citing Rachid,* 376 F.3d at 312), the Fifth Circuit Court of Appeals adopted a "modified *McDonnell Douglas* approach" in cases where the mixed-motive analysis may apply. After the plaintiff has met his four-element *prima facie* case and the defendant has responded with a legitimate nondiscriminatory reason for the adverse employment action

> The plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic. (mixed-motives alternative). *Id.* (*citing Rachid*, 376 F.3d at 312.)

The question of pretext versus mixed-motive treatment is only reached after a plaintiff has met his *prima facie* showing under the modified *McDonnell Douglas* standard and the defendant has responded with a legitimate nondiscrimatory reason. *Id.* Thereafter,

> [i]f the plaintiff demonstrates the protected characteristic was a motivating factor in the employment decision (meets the mixed-motive showing), which pursuant to *Desert Palace* may be achieved through circumstantial evidence, *Rachid*, 376 F.3d at 311-12) it then falls to the defendant to prove that the same adverse employment decision would have been made regardless of discriminatory animus. If the employer fails to carry this burden, plaintiff prevails." *Id.* at 312 (internal quotation marks and citation omitted).

*Keelan*, 407 F.3d at 341.

S & S argues Johnson cannot establish a *prima facie* case as his position, along with four other employees' positions, were eliminated, and no one was hired to fill those positions following the reduction in force. (Doc. 26, p. 7.) As stated above, this is not the proper *prima facie* standard when the case involves a reduction in force. However, S & S also argues in the alternative that other similarly situated employees were not treated more favorably because the factors applied to Johnson in making the reduction in force were applied to all other employees across the board. *Id.* The court agrees with this argument.

Though counsel's arguments and descriptions are less than clear, the court's review of the record for undisputed facts, as partially described in its table *supra*, shows that such facts establish that the following individuals were reduced in force in decreasing score order: Phillip Ramos, Wilfredo Ostroga-Segura, Willie Johnson, and Tiofilo Padilla. While Jose Velasquez (ranked above Johnson in total score) and Ramon Anzaldua and Jaime Diaz (both ranked below Johnson) were also reduced, through the intervention of S & S personnel, they were given the opportunity for transfers to alternate assignments after initially being informed of their reduction, and/or were retained because of their special skills. The only outlier, Simon Jordan, who ranked lower than everyone else in total score, was on leave at the time of reduction, and is irrelevant to the court's analysis. Furthermore, while Jordan may in fact have been retained at S & S, Jordan

had a higher Performance Appraisal score than Johnson, and safety and Seniority Scores equal to Johnson's; Jordan's only lower score was in Attendance (0) versus Johnson's (50).

Johnson's claim of disparate treatment is defeated by a careful look at the undisputed facts of each employee's reduction or non-reduction. Johnson asserts chiefly, outside of his race-based claim, that he was most troubled by how much his seniority was undervalued in the reduction process. The court notes first, however, that S & S's ranking system on its face, clearly assigns each employee his actual seniority level based upon his years of service (in Johnson's case it was 17.04), but then *weights* this seniority level by giving it a secondary value of 25, 50, 75, or 100. Although Johnson in fact received the highest Seniority Score possible, 100, the weighting of this score meant that seniority as a factor had less influence and had less relevance than it could have. While this may lead to a question of whether S & S unfairly weighted its standards against more senior employees, that is not the issue before the court as Johnson only asserts a claim for race discrimination under § 1981, not age discrimination. Johnson vaguely attacks S & S's design of its ranking system, but does not establish that it was racially biased. S & S was the foremost authority on the design of its ranking system, and courts do not usually deconstruct such systems unless they are guided through the process and pointed to the evident fallacies. Here, Johnson also cannot escape the ineluctable truth that two employees ranked above him were in fact terminated, both of whom had both *lower* seniority rankings but *higher* safety *and* performance appraisal scores than he did, namely: Phillip Ramos and Wilfredo Ostorga-Segura. This fact alone defeats the logic of Johnson's disparate treatment claim, as Johnson was black and these individuals were listed as "Hispanic." In other words, members of another racial group were treated the same as Johnson, i.e., were reduced, even though they were in fact ranked better than Johnson in every category except "seniority," which, as mentioned, is not a relevant category in this suit, but which point would weaken such a claim as well. In fact, when it comes to seniority, Tiofilo Padilla, an employee ranked higher than Johnson in both safety and in performance, although ranked lower overall than Johnson due to his extremely low seniority and seniority score,

was reduced. This shows that S & S did reduce less senior employees than Johnson, even if they were better ranked in other categories, and further weakens Johnson's claim.

Finally, Johnson devotes much argument to the fates of Ramon Anzaldua and Jaime Diaz, two employees who were ranked lower than Johnson but were not reduced. These arguments are unavailing in light of the fact that Johnson cannot overcome Ramos and Ostorga-Segura's reduction, but the court will analyze this issue as well. S & S has argued, and presented Scott Micheletti's affdiavit in support, that while Anzaldua and Diaz had lower scores than Johnson (overall), Micheletti made the decision to retain these employees because they had more advanced skills and had more duties and responsibilities than Johnson, who held only a basic welding certificate. (Doc. 26, Micheletti Aff., Ex. C, ¶ 6.) Anzaldua and Diaz did have higher Performance Appraisal scores (77 and 73, respectively) than Johnson (61). (Doc. 31, Ex. F.) In addition, the employment records provided by Johnson do in fact show that while he did good quality work, Johnson was not perceived as advancing or capable of assuming a wider range of duties, that he needed to speed up his performance on the job or had issues with timeliness, that he worked on tractors for 16 years, and that he needed to expand his skills. (Doc. 31, Ex. C.) Johnson nevertheless attacks the method by which Anzaldua and Jose Velasquez[3], were retained at S & S. Both Velasquez and Anzaldua were initially told in person that they would be reduced but were offered the opportunity to transfer to another department. Johnson apparently offers this as evidence of disparate treatment, but it appears that Johnson himself was *also* offered the opportunity to transfer to another part of the company also shortly after he was first informed of his reduction. (Doc. 26, Johnson Depo., Ex. A, p. 122:11-126:16.) Johnson criticizes this option, which was offered him as one that would have required him to take a demotion and which became moot when he suffered a stroke approximately three weeks after his termination. (*Id*.) Nevertheless, the court has not been pointed to evidence that Anzaldua and Velasquez were not

---

[3] Another employee with higher scores overall than Johnson in all categories (except seniority).

similarly placed into a demotion scenario; the fact remains that Johnson had the opportunity to be similarly transferred and chose not to accept, undercutting his disparate treatment claim.

Therefore, Johnson offers nothing more than his subjective beliefs that he was discriminated against, in opposition to S & S's legitimate non-discriminatory reason for his reduction and Anzaldua and Diaz's retention. Merely because Johnson may have been the *sole* black employee in the group under review, and to the extent Johnson can establish a prima facie case on the basis of this factor and the fact of his reduction alone, Johnson has neither provided circumstantial evidence to show that S & S's reason for retaining other employees is false, nor has he established a genuine material issue of fact concerning whether S & S was illegally motivated in reducing him. Johnson's subjective beliefs about the disparate treatment he received, or about the race-based discrimination he believes he suffered at the hands of Anthony Nguyen, discussed below, do not qualify as competent evidence for purposes of meeting his burden in creating a genuine issue of material fact for trial. Unsubstantiated and subjective beliefs and conclusory allegations and opinions are not competent summary judgment evidence. *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1986); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* 506 U.S. 825 (1992). The non-movant cannot discharge its burden by offering vague allegations and legal conclusions. *Lujan*, 497 U.S. at 889.

The undisputed evidence shows that Mr. Nguyen, although a Supervisor, was not in a position to impact Johnson's reduction or retention. There is evidence in the record concerning Johnson's slow rate of production that coincides, without contradicting, Johnson's assertions that Nguyen "bird-dogged" him as a supervisor. Further, there is no basis for believing that Mr. Nguyen said anything inappropriate to Johnson, as Johnson can neither remember the time, place, nor content of such statements, except that they occurred. The court is not making a credibility determination, although it is true that Johnson's deposition statements already evince strong internal contradictions with respect to Nguyen's behavior. Nevertheless, the court will stop

to note that Johnson also admits himself at several points that Nguyen "singled him out" for unknown reasons, even in relation to other African-American employees who were not so singled out, possibly because of Johnson's asserted Vietnam record.  This assertion does not support a claim for race discrimination under § 1981.

## IV.     Conclusion

        For the reasons stated above, the court hereby

        **ORDERS** that the Motion for Summary Judgment and Brief in Support (Doc. 26) of the Defendant, Stewart & Stevenson Services, Inc., is **GRANTED**; and it is further

        **ORDERED** that Defendant's Motion to Strike the Response to Motion for Summary Judgment (Doc. 34) is **DENIED**.

        **SIGNED** at Houston, Texas, this 3rd day of November, 2006.

        _____
        MELINDA HARMON
        UNITED STATES DISTRICT JUDGE